BOXWELL, et al. *v.* CHAMPAGNE, et al.

No. 40286 December 3, 1956 91 So. 2d 256

356

*Robertson & Cruthirds,* Jackson, for appellants.

*Creekmore & Beacham,* Jackson, for appellees.

LEE, J.

Two suits, styled L. G. Boxwell, et al., d. b. a. Louisiana Metal Culvert Company, were instituted in the County Court of Hinds County against Edwin C. Champagne and Albert Switzer. One sought to recover on a demand note, dated September 19, 1950, in the sum of $2,000, without interest; and the other on a like note, dated October 3, 1950, in the sum of $1,000.

The answer of Champagne set up in effect that he and Joel F. Fisher, Jr., executed the notes, which were endorsed by Switzer, to H. H. Manner, and that Manner thereafter, without his knowledge or consent, materially altered and changed the name of the payee from H. H. Manner to "L. G. Boxwell, H. H. Manner and T. F. Donlon, d. b. a. The Louisiana Metal Culvert Company"; that the money, represented by the notes, was advanced by Manner as a part of his share of the expenses of a joint venture with him and others to obtain a contract with the United States for the operation of a flight training school; that the venture failed; and that, for both reasons, he was not chargeable with any part thereof. To the same effect was the separate answer of Switzer, who pled also that he, as endorser, offered to pay the notes after the collapse of the venture, but that Manner refused to accept payment, stating that the face amount thereof constituted a part of the share of himself and associates in the joint venture, and that Manner thereupon, for a sufficient consideration, caused the name of the payee to be changed; and that, for these reasons, he was not liable.

At the conclusion of the evidence, the two causes having been consolidated by agreement, the county judge, sitting as both judge and jury, without rendering a written opinion, found for the defendants. Judgment was entered accordingly; and on appeal to the circuit court, the cause was affirmed. The plaintiffs have appealed here.

This lawsuit grew out of the failure to obtain a government contract. All of the parties lived at the time in Baton Rouge, Louisiana. Manner and Switzer were closely associated in a personal and business way. Fisher operated a used car lot, and Champagne, a brother-in-law of Switzer, worked for him. Fisher was experienced in veteran training work. Prior to July 1950, he had begun to work on the idea of trying to get a government contract either at Greenville, Mississippi, or some other place. He and Champagne talked to Switzer, who was favorably impressed, and he in turn talked to Manner, who was also favorably impressed with the proposition.

Switzer testified in effect that, in his conference with Manner, it was understood that Fisher and Champagne could not run the used car lot and at the same time make the necessary investigations to pursue this venture; that if this business was given up, another source of income was necessary; that $2,000, the proceeds from the first note, was loaned to them for the sole purpose of finding out where the next school would be located; that the money was used for telephone bills, the expenses of investigations, trips, etc.; that they enlisted the services of a senator and congressman, and that the matter was accelerated; that Manner then advanced the $1,000 for which the second note was executed; that he felt a sense of responsibility in bringing his brother-in-law and his friend to Manner, and, as Manner was putting up the money personally, he offered to, and did, endorse the notes to show that he was not "bringing a shark", but that it was in good faith; that he and his partners put up about $2,500, closely paralleling what Manner had put up, for expenses, and were to be reimbursed with stock; and that all of the parties were interested and agreed that, at the proper time, a corporation would be organized and the settlement at the time would be made according to participation.

Champagne testified in effect that, after the conference with Switzer and Manner, the money from the notes was advanced to bear the expenses of trying to get the contract; that he and Fisher contracted army officers with whom they were acquainted, and both of them made a trip to Dayton, Ohio; that from September 19th to October 3rd, and after that date, Fisher spent all of his time on the project; that he made trips to Greenville, Columbus, Washington, Florida and other places; that the understanding was that he and Fisher would get an interest in the company for their work and experience, and they were not to put up any money; that Manner, in his opinion, offered to put up the $3,000; that he himself felt pretty sure that they would get the contract, and he did not think that he would ever have to repay the notes personally; that the money so advanced from the notes was not to pay for their shares in the venture; and that Switzer volunteered the endorsement to guarantee that he and Fisher were not trying to beat Manner out of anything.

Manner testified that the money was advanced to Fisher and Champagne as a loan for their equity in the company, although he admitted that the papers for the organization of the corporation were not signed until November 30, 1950; that the stockholders in the corporation to be known as Flight, Inc. were Manner and his partner, Boxwell, each with 105 shares, Switzer and his two partners Barry and Porter, each with 70 shares, and Fisher and Champagne, each with 90 shares; and that he, Switzer and Fisher were to be the directors. All of the parties were working on the project, putting their time, effort and money, into it. All were giong to have to buy an interest. No money was ever paid into the corporation as cash in exchange for stock, as it did not get that far along. He did not remember whether Fisher was to get his stock for his idea and service, nor did he remember that he was not to pay for it. The notes did not

bear interest, and he admitted that it was not a strict business deal, but said that it was more of a favor to Switzer. He admitted that the notes were charged off as a bad debt insofar as his company was concerned, and he may have taken a tax reduction on them, but that they were actually carried as notes receivable; that from 1951, when Flight, Inc. collapsed until 1954, when this suit was filed, he made no written demand for payment; and that the suit was filed to recover on the notes after Switzer had filed a suit against a corporation in which he was a minority stockholder.

The proof showed that all of the parties were sanguine in their hopes that Flight, Inc. would be awarded the contract. The bidders had been whittled down to it and one other company. However, at this juncture, the F. B. I. report developed that Fisher had some kind of unsatisfactory record. The result was that the other company obtained the contract, and Flight, Inc. immediatelly collapsed about the first part of 1951.

Switzer further testified that, following the collapse, one of his partners, Porter, expressed the feeling that he should have investigated Fisher more thoroughly, and was inclined to blame him for the failure. Thereupon, he determined that, if he was to be blamed, he would pay the notes himself. So, he borrowed the money, went to Manner, made out a check for $3,000, and offered the same to him in payment; but Manner refused to accept the check, saying that Switzer was no more at fault than anyone else, that his company had put money into the venture and was aware of the situation, that he did not feel entitled to take it, and that he was going to charge it off as a bad debt. Switzer said that he had originally prepared the notes on his L. C. Smith typewriter; and that, following the refusal of the check, Manner asked him to take the notes and alter them on his typewriter and include the name of his company as the loss was actually a partnership loss. Switzer made the alterations, as re-

quested, without the knowledge of Fisher or Champagne, and returned the notes to Manner.

Manner denied that there was any change in the name of the payee since the notes came into his possession, saying that the payees now are just as they were at the time the money was advanced and the notes were delivered to him, and that he did not cause anyone to make a change therein. On cross-examination he was asked, "Isn't it true on that occasion you told Mr. Switzer that since this was a joint venture between all of you and since your partners were interested in it as well as you individually, that you would like to have the notes changed so as to show the names of all of them as payees rather than you individually?", and his answer was, "I don't remember that." Again he was asked, "And didn't you then request Mr. Switzer to take the notes and add the names of these other parties in it so that you could show it on the books of your company as as a partnership loan?", and his answer was, "I don't remember that." He denied that he told Switzer to forget about the notes, claiming that he said that he hoped that Switzer would not have to pay them, and denied that Switzer offered him the check in payment.

J. L. Godown, of Memphis, Tennessee, testified at great length as to his experience and ability as an expert examiner of questioned documents; and after detailed explanations, said that the names of the payees other than H. H. Manner were placed on the notes subsequent to the original writing, and on a different insertion of the papers in the typewriter, which was either an L. C. Smith or a Smith Corona machine. This evidence served as corroboration of Switzer, who testified that he altered the name of the payee.

 On the sharply disputed issue of fact, the trial court was warranted in concluding that the name of the payee in the notes was changed by Switzer at the instance of Manner and without the knowledge or consent of

Champagne. ██ ██ This was a material alteration and voided the instruments insofar as Champagne was concerned. Sections 7:124 and 7:125 L. S. A. Act No. 64 of 1904, identical with Sections 165 and 166, Miss. Code of 1942. See also Alford v. Delatte, 160 La. 712, 107 So. 500; Hammond State Bank v. Strawberry Growers Association, Ltd., 162 La. 27, 110 So. 77. See also Upton v. Bush, 141 Miss. 660, 107 So. 284; Holmes v. Ford, 179 Miss. 673, 176 So. 524.

However, Section 165, supra, provides in part: "Where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided, except as against a party who has himself made, authorized or assented to the alteration, and subsequent indorsers."

██ ██ Consequently a different rule applies as to Switzer, who actually made the alteration in the name of the payee. However, it is not necessary to go into this question further in view of the conclusion which has been reached on another angle of the case.

██ ██ Joint adventure may be said to be an association of two or more persons to carry out a single business enterprise for profit. 30 Am. Jur., Joint Adventurers, p. 677. ██ ██ For such purpose, they combine their property, money, effects, skill and knowledge. Ibid. p. 678, and agree to share jointly or in proportion to the capital contributed in the profits and losses. Ibid. p. 681. ██ ██ One may provide the necessary funds and another may put up only his labor, skill or experience. Ibid. p. 690. ██ ██ The contract need not be expressed or embodied in a formal agreement. It may be inferred from the conduct of the parties and from the facts and circumstances. Ibid. p. 681. ██ ██ It has been held that any advantage obtained by the payment of cash accrues to the benefit of all of the adventurers even though the necessary funds are advanced by one of them. Ibid. p. 693. ██ ██ An agreement to pay losses is actually involved in the enterprise. ██ ██ But in several instances

it has been held that where the contribution of a party to the adventure consists merely of services which are performed, he is not liable to his associates on account of financial losses sustained in the venture. Ibid. p. 694.

 ██ If money, loaned to another for use in the enterprise, is to be repaid by the borrower, whether the venture succeeds or fails, the contract is ordinarily construed as one of lending and borrowing and not of joint adventure. "Under some circumstances, however, the relationship of parties in a transaction may be that of joint adventurers rather than that of debtor and creditor, where such is the intent and affect of their agreement. So, if the person receiving the money assumes no obligation for its return and it is subject to the risks of the business, the parties have usually been held to be joint adventurers, notwithstanding the contract provides that the money is to be returned with interest before the net profits are divided, or that the lender is to receive notes as security for the money invested, or is to be given a lien on the property put into the venture." 48 C. J. S., Joint Adventurers, pp. 804-5. But "joint adventurers may agree to fix their rights as they choose." Ibid. p. 824. ██ Joint adventurers are not liable to each other for repayment at all events for money advanced for use in the joint adventure, in the absence of waiver or estoppel, although a member is entitled to contribution or reimbursement for all expenditures made in the ordinary course of the affairs of the enterprise. Ibid. p. 837. ██ Generally speaking, necessary and reasonable costs and expenses incurred in promoting a joint adventure are a first charge on its proceeds. Ibid. p. 844. See also Sample v. Romine, 193 Miss. 706, 8 So. 2d 257.

This point turns on whether the $3,000, which was received upon the execution of the notes, constituted a loan or was in fact money advanced for the expenses incident to obtaining the contract, and for subsistence during that period.

It was not shown that Fisher or Champagne were men of any means. On the contrary, Switzer testified that it was recognized that they would have to have an income during the time, as they could not simultaneously operate the used car lot. Obviously to live and incur the expenses of numerous plane and other trips to various parts of the country over a period of four months or more entailed the expenditure of considerable sums of money. Undoubtedly, that is how the money was spent. While Manner testified that this money was to pay for the interest of Fisher and Champagne in Flight, Inc., it was in fact advanced before a contract was obtained and before Flight, Inc. was organized. If Switzer told the truth, Manner refused to accept payment by him of the notes and frankly acknowledged that the money was spent in a joint adventure, and he and his partners would take their loss accordingly. It appears that these notes were actually charged off as bad debts, and that no effort whatever was made to collect them for over three years, until Switzer sued a corporation in which Manner was interested.

 A consideration of all of the facts and circumstances on this sharply disputed issue leads to the conclusion that the trial judge had substantial evidence to justify a finding that the $3,000 in question constituted a part of the necessary expenses in promoting a joint adventure, and that, since the contract was not obtained, the venture failed, and that this money may not be recovered from Switzer or Champagne. At least, we cannot say that he was manifestly wrong. Third persons were not involved. Only the original parties, except Fisher, who was not sued in this jurisdiction, were involved.

The trial judge, on motion of the defendants, who contended that the name of the payee had been changed and that it was necessary to obtain the opinion of an expert to testify thereto on the merits, granted them the right,

under Section 1659, Code of 1942, to inspect the original notes, and permitted them to submit the same to an expert, upon their entering into bond in the sum of $6,000, conditioned for the payment of all damages that might be sustained in event that they were lost, destroyed, or otherwise unavailable on the trial. The notes were sent to an expert, J. L. Godown, in Memphis, Tennessee, who made an examination in his laboratory, and subsequently testified on the trial of the case. The appellant contends that the statute, Section 1659, supra, is highly penal, as held in Equitable Life Assurance Society v. Clark, 80 Miss. 471, 31 So. 964, and that the court's action constituted prejudicial and reversible error.

There is no doubt that the trial court committed error in this regard. The statute does not contemplate such procedure. However, the record does not disclose that the plaintiffs, either by written plea or evidence, objected thereto, or pointed out wherein the motion should not be granted. Besides the evidence of the expert was not objected to on the ground that it was obtained under a court order in contravention of the statute. Obviously the expert could have brought his equipment from Memphis to Jackson and made the inspection in the jurisdiction and presence of the court. This of course might have been inconvenient and expensive. It could have been contended very persuasively by the plaintiffs, at the time, that such a course was necessary to give assurance that the notes would not be changed or otherwise be tampered with. But there was not a scintilla of evidence to show that such a thing occurred. On the contrary, insofar as the record shows, the notes were restored to the possession of the plaintiffs in the same condition as they were when they were delivered to the defendants. Consequently it does not appear that either injury or prejudice resulted from this error, and the cause cannot be reversed on that ground.

From which it follows that the judgment must be, and is, affirmed.

Affirmed.

*McGehee, C. J.,* and *Hall, Kyle* and *Holmes,* JJ., concur.